UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-mc-93017-MGM |
| | ) | |
| TIMOTHY LAMOTTE, Treasurer of Northern | ) | |
| Tree Service, Inc., | ) | |
| | ) | |
| Respondent. | ) | |

REPORT AND RECOMMENDATION REGARDING
PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONSES
(Dkt. No. 1)
April 19, 2016

ROBERTSON, U.S.M.J.

I.      Introduction

The United States filed a petition pursuant to 26 U.S.C. § 7604 to judicially enforce two

Internal Revenue Service ("IRS") summonses issued to Respondent Timothy LaMotte

("Respondent"), as Treasurer of Northern Tree Service, Inc. ("Northern") (Dkt. No. 1).  The

petition to enforce was referred to the undersigned for report and recommendation (Dkt. No. 3).

For the reasons set forth below, the court recommends that the petition be DISMISSED.

II.      Background

The IRS is investigating Northern's tax liability for the 2012 and 2013 tax years,

including an examination of Northern's utilization of a captive insurance tax structure.  As

explained by the IRS:

> Tax law allows businesses to create 'captive' insurance companies
> to enable those businesses to protect against certain risks.  The
> insured claims deductions under the tax code for premiums paid
> for the insurance policies while the premiums end up with the

> captive insurance company owned by the same owners of the insured or family members.
>
> The captive insurance company, in turn, can elect under a separate section of the tax code to be taxed only on the investment income from the pool of premiums, excluding taxable income of up to $1.2 million per year in net written premiums.

I.R.S. News Release IR-2015-19 (Feb. 3, 2015).  While the captive insurance structure can be used legitimately, the IRS has included abuse by "small or 'micro' captive insurance companies" on its annual list of tax scams known as the "Dirty Dozen" for the 2015 filing season.  *Id.*  Again, as explained by the IRS:

> In an abusive structure, unscrupulous promoters persuade closely held entities to participate in this scheme by assisting entities to create captive insurance companies onshore or offshore, drafting organizational documents and preparing initial filings to state insurance authorities and the IRS.  The promoters assist with creating and "selling" to the entities often times poorly drafted "insurance" binders and policies to cover ordinary business risks or esoteric, implausible risks for exorbitant "premiums," while maintaining their economical commercial coverage with traditional insurers.
>
> Total amounts of annual premiums often equal the amount of deductions business entities need to reduce income for the year; or, for a wealthy entity, total premiums amount to $1.2 million annually to take full advantage of the Code provision.  The promoters mange the entities' captive insurance companies year after year for hefty fees, assisting taxpayers unsophisticated in insurance to continue the charade.

*Id.*

Respondent is the Treasurer of Northern and a director of the two captive insurance companies, CJA Insurance ("CJA") and PTK Insurance ("PTK"), that provided insurance to Northern in 2012 and 2013.  In income tax returns for the 2012 and 2013 tax years, Northern deducted the costs of the premiums it paid to CJA and PTK, while CJA and PTK excluded the premiums from their income.  Artex Risk Solutions, Inc., ("Artex") is the exclusive manager of

both CJA and PTK, serving as their custodian of records and handling all of their day-to-day activities, including underwriting, claims adjustment and processing, and administering all regulatory requirements.

The IRS considers Northern to have been a participant in an "abusive captive insurance program" (Dkt. 1 at p. 2). Simultaneous to its investigation of Northern, the IRS is investigating CJA's and PTK's tax liabilities for the same tax years and is conducting a promoter investigation of Artex under 26 U.S.C. § 6700, which establishes penalties for promoting abusive tax shelters. Defined broadly, promoters of abusive tax shelters are persons who "organize, promote or sell …. '… an illegal method by which to avoid paying taxes.'" *United States v. Stover*, 650 F.3d 1099, 1107-08 (8th Cir. 2011) (quoting *United States v. Benson*, 561 F.3d 718, 722 (7th Cir. 2009)).

As part of the IRS's investigation of Northern, IRS Revenue Agent Charles Britten issued two administrative summonses to Respondent as representative for Northern (Dkt. 1-2, 1-3). One is for documents related to Northern's "participation in an abusive captive insurance program" (Dkt. 1 at p. 2). The other is for testimony regarding Northern's tax liabilities for the 2012 and 2013 tax years. Respondent appeared in response to the summons for documents on February 4, 2015, but did not produce any documents at that time. Respondent also appeared in response to the summons for testimony on March 4, 2015. Revenue Agent Britten posed 103 questions to Respondent, all of which related to the captive insurance transactions under review. In response to each question, Respondent invoked his right under the Fifth Amendment not to answer.[1]

---

[1] The full transcript of Respondent's March 4, 2015 interview with the IRS is attached as an exhibit to the government's reply brief at Dkt. No. 12-3.

III.   Procedural History

Based on the government's petition and attached exhibits, including copies of the summonses (Dkt. No. 1-2 and 1-3) and a declaration from Revenue Agent Britten (Dkt. No. 1-1), the court found that the United States had established a *prima facie* case for enforcement (Dkt. No. 4). Specifically, the court found that the government's initial pleadings supported a good-faith presumption in favor of the IRS based on the government's representations that the examination of Northern is being conducted for a legitimate purpose, the information sought is or may be relevant to that purpose, the information is not already within the IRS's possession, and the administrative steps required by the Internal Revenue Code have been followed. *United States v. Powell*, 379 U.S. 48, 57-58 (1964) (setting forth the four elements of the government's *prima facie* case); *Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (noting that the burden on the IRS is "minimal" and that "[a]n affidavit of the investigating agent that the *Powell* requirements are satisfied is sufficient to make the *prima facie* case"). Accordingly, the court issued a briefing schedule and ordered Respondent to appear and show cause why he should not be compelled to obey the summonses (Dkt. No. 4). Respondent filed an answer and defenses to the petition (Dkt. No. 11), to which the United States replied (Dkt. No. 12), and, with leave of court (Dkt. No. 14), Respondent sur-replied (Dkt. No. 15). The court held an evidentiary hearing on the show cause order on November 16, 2015.

IV.   Discussion

A.   The Framework for Enforcement Proceedings

Section 7601 of the Internal Revenue Code (the "Code") gives the IRS "a broad mandate to investigate and audit 'persons who may be liable' for taxes." *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). To enable it to fulfill its investigative and enforcement responsibilities,

Congress has endowed the IRS with "expansive information gathering-authority." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).  In particular, § 7602 of the Code confers on the IRS broad authority to examine records, to issue administrative summonses, and to take testimony "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining liability of any person for any internal revenue tax … or collecting any such liability."  26 U.S.C. § 7602(a).  When an individual fails to obey an IRS summons, the government may petition a federal district court for an order of enforcement.  26 U.S.C. § 7604.  The IRS may not issue a summons or commence an enforcement proceeding "with respect to any person if a Justice Department referral is in effect with respect to such person."  26 U.S.C. § 7602(d)(1).

"[A] proceeding to enforce an IRS summons is an adversary proceeding in which the defendant may contest the summons 'on any appropriate ground….'"  *United States v. Rylander*, 460 U.S. 752, 757 (1983) (quoting *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)).  "The court's role is to ensure that the IRS is using its broad authority in good faith and in compliance with the law."  *Sugarloaf*, 584 F.3d at 345 (quoting *United States v. Gertner*, 65 F.3d 963, 966 (1st Cir. 1995)).  Once the IRS makes its *prima facie* showing that it is acting in good faith, as set forth above, "the burden shifts to the taxpayer to disprove one or more of the *Powell* requirements, or to show that enforcement would be 'an abuse of process ….'"  *Id*. at 346 (quoting *Sterling Trading, LLC v. United States*, 553 F. Supp. 2d 1152, 1155-56 (C.D. Cal. 2008)).  "If the taxpayer satisfies this burden …. the district judge weighs the facts, draws inferences, and decides the issue."  *Gertner*, 65 F.3d at 967.  To do this, a court may, but is not required to, hold an evidentiary hearing.  *Id*.

B.  The Document Summons

At the time the government filed its petition, the government maintained that it was not in possession of all of the records sought by the IRS document summons because Respondent had not produced all responsive documents, including, in particular, email communications between Northern and other parties "regarding the abusive captive insurance program."  (Dkt. 1 at ¶¶ 10-11, 13; Dkt. 1-1 at ¶¶10-11).  On this basis, the court found that the government had satisfied the non-possession element of *Powell*'s *prima facie* case.

In response, Respondent maintained that he had produced (or caused to be produced) all required documents.  In a declaration accompanying his answer and defenses, Respondent averred that he had conducted an "exhaustive search" and did not possess any responsive email communications (Dkt. No. 11-1 at ¶ 10).  Accounting for the absence of responsive emails, Respondent described an historical routine practice of moving all email communications (of which he received hundreds on a daily or weekly basis) to his "deleted" folder after reading and responding to them if necessary or appropriate, keeping his email "inbox" and "outbox" folders empty on a daily basis, and permanently deleting the emails in the "deleted" folder when he received periodic notifications that he was approaching the limits of Northern's electronic memory capacity (Dkt. 11-1 at ¶ 10).  Respondent further averred that, with respect to policy documents, he had produced all records in Northern's possession that were responsive to the summons and that he had caused Artex, as custodian of records for CJA and PTK, to produce all records in its possession that were responsive (Dkt. No. 11-1 at ¶ 11).

In its reply, the United States sought the opportunity to cross-examine Respondent and test the assertions in his declaration.  The United States had this opportunity at the show cause

hearing (Dkt. No. 17 at pp. 79-91).[2]  Respondent testified consistently with his declaration, while

providing additional information, including:  describing the search he conducted for responsive

emails through the use of search terms; advising that he was solely responsible for Northern's

insurance issues and that the only email communications regarding captive insurance would have

been between him and Artex's predecessor in 2011 and 2012; explaining that the email non-

retention practices described in his declaration started when Northern first started using email

and lasted continuously through late 2014, when he became aware that the IRS was seeking the

production of emails; and advising that he received the memory capacity limit notifications

described in his declaration approximately every two months (Dkt. No. 17 at pp. 79-91).  The

United States also cross-examined Northern's information technology technician, John Miller,

regarding whether the deleted emails might exist in obtainable archival or backup form (Dkt. No.

17 at pp. 75-79).  At the end of the hearing, the only issue left open was the possibility that the

United States might seek an order shifting the costs of attempting to recover the deleted emails to

Respondent.  The deadline the court set for the government to do so passed without the United

States filing anything, and the parties jointly notified the court, through the Clerk's office, that

the case was ready for decision (Dkt. No. 16; Dkt. No. 17, at pp. 91-94).[3]

---

[2] The parties agreed that Respondent's testimony at the show cause hearing would not act as a
waiver of his Fifth Amendment privilege claim as to the underlying transactions (Dkt. No. 17 at
p. 75).
[3] The United States' decision to forego pursuit of cost-shifting makes sense, given Mr. Miller's
testimony that the oldest backup of Northern's server is from December 31, 2013, and that,
assuming the truth of Respondent's representations in his declaration, if that tape were to be
restored, the oldest emails that conceivably could be recovered from it would be from October
2013, long after respondent engaged in any email communications regarding captive insurance
(Dkt. No. 17 at pp. 76, 79).

Based on this record, the undersigned recommends that the court find that the United States is not entitled to an order of enforcement as to the document summons because the IRS is already in possession of summoned documents in Respondent's possession, custody, or control.

### C.  The Summons for Testimony

Respondent has not attempted to disprove any of the *Powell* requirements with respect to the summons for testimony.  Rather, Respondent raises his Fifth Amendment privilege in defense of the government's petition.

An IRS summons is "subject to the traditional privileges and limitations," *Arthur Young & Co.*, 465 U.S. at 816 (quoting *United States v. Euge*, 444 U.S. 707, 714 (1980)), including the Fifth Amendment privilege against compulsory self-incrimination, *United States v. Allee*, 888 F.2d 208, 214 (1 Cir. 1989).  "The recipient of a summons properly must appear before the IRS agent and claim the privilege on a question-by-question … basis," as Respondent did.  *Id*. at 212. Thereafter, it is for the court to "evaluate the validity of such objection on the same particularized basis."  *Id*. at 214 (footnote omitted).

The availability of the protection offered by the Fifth Amendment requires "the prospective witness [to] show at the very least that he is faced with some authentic danger of incrimination."  *United States v. Castro*, 129 F.3d 226, 239 (1st Cir. 1997).  The burden on the witness is not "particularly onerous."  *Id*. at 229.  "While chimerical fears will not suffice, the prospective witness need only limn some reasonable possibility that, by testifying, he may open himself up to prosecution."  *Id*. (citing *In re Kave*, 760 F.2d 343, 354 (1st Cir. 1985)).

The reasonableness of the claimed apprehension is a "determination for the court, not the witness, to make … and is subject to the discretion of the district court."  *Id*. (citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).  "A trial judge may appraise a claim of privilege in

light of his 'personal perception of the peculiarities of the case' and should not be overruled unless it is 'perfectly clear' that the witness is mistaken and that the answers 'cannot possibly' incriminate." *United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir. 1973) (quoting *Hoffman*, 341 U.S. at 487-488).  To the extent the privilege applies, "it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972) (footnotes omitted).  *See also Hoffman*, 341 U.S. at 485-86 ("The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."); *Kave*, 760 F.2d at 354 ("To invoke the privilege, it is not necessary that the witness show that his testimony would be certain to subject him to prosecution, or that it will prove the whole crime, unaided by other evidence.  It is enough if there is a reasonable possibility of prosecution, and if the testimony, although falling short of proving the crime in its entirety, will lend to a conviction when combined with evidence from other sources.").

    To determine whether Respondent validly asserted the privilege in response to Revenue Agent Britten's questions, the United States directs the court to the two-step process the Fourth Circuit employed in *United States v. Sharp*, 920 F.2d 1167, 1170-71 (4th Cir. 1990).  In the first step, the court determines "whether the information is incriminating in nature," either "on its face, in light of the question asked and the circumstances of its asking," *id.* at 1170 (citing *Hoffman*, 341 U.S. at 486-87), or as demonstrated "by further contextual proof," *id.* (citing *United States v. Rylander*, 460 U.S. 752, 758-59 (1983)).  If the incriminating nature of the information is established either way, the court proceeds to the second step, in which it

determines "whether criminal prosecution is sufficiently a possibility, all things considered, to trigger the need for constitutional protection," by "assess[ing] the objective reasonableness of the target's claimed apprehension of prosecution." *Id*. at 1171.  Significantly, the *Sharp* court explained that, "on the better view of things …, the reasonableness of a claimed apprehension should simply be assumed once incriminating potential is found, unless there are genuine questions about the government's legal ability to prosecute." *Id*. (footnote omitted).  Stated another way, "once incriminating potential is found to exist, courts should not engage in raw speculation as to whether the government actually will prosecute." *Id*. (citing *United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir. 1984)).  Rather, courts "should only pursue that inquiry when there are real questions concerning the government's ability to do so because of legal constraints such as statutes of limitation, double jeopardy, or immunity." *Id*. (citing *In re Folding Carton Antitrust Litig.*, 609 F.2d 867, 872 (7th Cir. 1979)).

The First Circuit has not explicitly adopted the two-step process set forth in *Sharp*, but the framework is consistent with the court's Fifth Amendment jurisprudence, requiring that "[a]nyone claiming the privilege … must be 'confronted by substantial and "real," and not merely trifling or imaginary hazards of incrimination.'" *United States v. Pratt*, 913 F.2d 982, 990 (1st Cir. 1990) (quoting *Rogers v. United States*, 340 U.S. 367, 374, *reh'g denied*, 341 U.S. 912 (1951)).  Moreover, in assessing whether the threat of prosecution is "substantial and real," the First Circuit focuses on the possibility, rather than the probability, of prosecution.  *Johnson*, 488 F.2d at 1209, n.2 (citing *United States v. Chase*, 281 F.2d 225, 230 (7th Cir. 1960)).  This approach is consistent with the Fourth Circuit's admonition in *Sharp* that, absent some legal impediment to prosecution, the district court should assume the objective reasonableness of a target's claimed apprehension of prosecution once it finds incriminating potential.  *Id*., 920 F.2d

10

at 1171.  It is also consistent with the law in a number of other circuits.  *See United States v. Edgerton*, 734 F.2d 913 (2d Cir. 1984) (quoting *United States v. Jones*, 703 F.2d 473, 478 (10th Cir. 1983)) (finding that the appellant's claim of Fifth Amendment privilege should not be rejected because "his fear of criminal prosecution was too remote or speculative," because "[o]nce the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted."); *Folding Carton*, 609 F.2d at 872 (quoting *In re Master Key Litig.*, 507 F.2d 292, 293 (9th Cir. 1974)) ("[W]e agree with the Ninth Circuit Court of Appeals that the right to assert one's privilege against prosecution 'does not depend upon the likelihood, but upon the possibility of prosecution'").  Accordingly, the court will analyze Respondent's invocation of his Fifth Amendment privilege under the process enunciated in *Sharp*, as urged by the government.

Here, the incriminating nature of the testimony sought from Respondent is evident on its face.  All of Revenue Agent Britten's questions relate to Northern's participation in the captive insurance transactions that the United States has told the court it considers abusive, i.e. an illegal method to avoid paying taxes.  *Stover*, 650 F.3d at 1107-08.  Title 26 § 7201 of the Code makes willful tax evasion a criminal offense, while § 7206(1) provides that willfully making and subscribing to a false return is a criminal offense.  Answering Revenue Agent Britten's questions regarding the captive insurance transactions under investigation would open up Respondent to the possibility of prosecution under either or both of these provisions.  Respondent included with his sur-reply a question-by-question explanation as to how each of Revenue Agent Britten's 103 questions sought to elicit testimony from Respondent that reasonably could be used against him in a criminal prosecution to prove, or provide a link in the chain of evidence to prove, elements of tax evasion or subscribing to a false return, including willfulness, *Cheek v. United States*, 498

U.S. 192, 201-02 (1991), or the taking of an affirmative act constituting an evasion or attempted evasion of a tax, *Sansone v. United States*, 380 U.S. 343, 351 (1965), or could lead to other evidence that might be so used (Dkt. No. 15 at pp. 53-68).  The United States did not respond on a question-by-question basis that Revenue Agent Britten's questions are not of an incriminating nature.  The United States' position is that the questions as a group are directed squarely at determining the civil liability aspects of Northern's captive insurance program.  The one does not negate the other, however.  While the testimony elicited by the questions might be relevant to Respondent's civil liability, it simultaneously would expose Respondent to the possibility of criminal prosecution.  Therefore, the court agrees with Respondent and accepts Respondent's question-by-question analysis attached to his sur-reply (Dkt. No. 15 at pp. 53-68) as to the incriminating nature of each question.

With the incriminating nature of the questions established, the court proceeds to the second step identified in *Sharp*.  The court has not been made aware of any legal obstacles that would constrain the government's ability to prosecute Respondent for tax evasion or false statements in connection with Northern's 2012 or 2013 returns, and, therefore, the court assumes the objective reasonableness of Respondent's apprehension of prosecution, as *Sharp* counsels. *Id*., 920 F.2d at 1171.  *Cf. Johnson*, 488 F.2d at 1209, n.2.  The court declines to engage in conjecture as to whether Respondent will, in fact, be prosecuted, or to attempt to quantify the magnitude of the risk of prosecution in some purely speculative fashion.  *See id*.

The United States' argument that Respondent's fear of criminal prosecution is not sufficiently real and substantial because Revenue Agent Britten asked his questions in the

context of a civil investigation of Northern's tax liability is unavailing.[4]  The fact that the

investigation is presently civil does not eliminate the possibility of a criminal prosecution in the

future.  To the contrary, "the structure of the IRS, the nature of the summons procedure, and the

facts of this case compel the conclusion that the government's position is incorrect."  *United*

*States v. Argomaniz*, 925 F.2d 1349, 1353 (11th Cir. 1991) (rejecting the government's argument

that the witness's fear of self-incrimination was remote and speculative because "[t]here can

exist a legitimate fear of criminal prosecution while an IRS investigation remains in the civil

stage").  The IRS's "criminal and civil elements are inherently intertwined."  *United States v.*

*LaSalle Nat'l Bank*, 437 U.S. 298, 309 (1978).  "[A] 'routine tax investigation' may be initiated

for the purpose of a civil action rather than criminal prosecution," but "tax investigations

frequently lead to criminal prosecutions."  *Mathis v. United States*, 391 U.S. 1, 4 (1968) (holding

that even in routine tax investigations a person in custody, regardless of the reason for his

detention, must be given *Miranda* warnings).  Several courts of appeals and district courts have

reached the same conclusion and upheld Fifth Amendment challenges to IRS summonses in civil

investigations.  *Argomaniz*, 925 F.2d at 1354 (holding that compliance with an IRS summons

could violate a taxpayer's Fifth Amendment privilege where he was being investigated civilly for

failure to file returns because willful failure to file income tax returns is a crime); *Sharp*, 920

F.2d at 1171 (holding that the Fifth Amendment provided a taxpayer with a valid basis for

refusing to answer questions propounded by the IRS in the course of a civil investigation where

he was asked to provide information directly relating to his income and his knowledge of it for

---

[4] Notably, the United States stakes out this position "even if Respondent could somehow show
that the questions seek potentially incriminating information," (Dkt. No. 12 at p. 12), an assertion
at odds with *Sharp*'s direction that the reasonableness of the claimed apprehension be assumed
once incriminating potential is found.

the years in which he was under investigation for failing to file returns); *United States v. Rendahl*, 746 F.2d 553, 555-56 (9th Cir. 1984) (holding that the district court committed error when it found that the respondents had not established a valid Fifth Amendment privilege where they were being asked as part of an IRS investigation of another person to give information relating to their income, which could subject them to liability for failure to file returns); *United States v. Ali*, No. PWG-13-3398, 2014 WL 5790996, at *10-11 (D. Md. Nov. 5, 2014) (finding that the respondent properly invoked the Fifth Amendment in response to the IRS's questions because her answers, if they contradicted statements made on her income tax returns, potentially could show that she willfully misrepresented her income or other information relating to her tax liability); *United States v. O'Shea*, 662 F. Supp. 2d 535, 542-43 (S.D. W. Va. 2009) (holding that taxpayers asserted a valid Fifth Amendment affirmative defense to being compelled to provide testimony about two trusts that they allegedly administered – such as the purpose of the trusts, who created the documents establishing the trusts, and the operation of the trusts – where the IRS considered the trusts to be part of an abusive arrangement created for the purpose of avoiding internal revenue taxes); *United States v. Aeilts*, 855 F. Supp. 1114, 1118-119 (C.D. Cal. 1994) (holding that the respondent asserted a valid Fifth Amendment defense to providing testimony regarding his tax liability for tax years for which the statute of limitations for willful failure to file a return had not yet run because the questions put to him by the IRS would help the government prove that he received taxable income during those years yet knowingly failed to file returns); *United States v. Cates*, 686 F. Supp. 1185, 1191 (D. Md. 1988) (holding that the taxpayer's fear of incrimination was not too remote or speculative to support invocation of the Fifth Amendment where the IRS sought to obtain testimony from him regarding his civil tax liability for years in which he failed to file returns).

The United States' argument that there is not a sufficient threat of criminal prosecution to trigger constitutional protection is even less tenable given the larger context in which its investigation of Northern is proceeding. The IRS considers Northern to have been a participant in an abusive captive insurance program, and is simultaneously examining the returns of its captive insurers, CJA and PTK, and conducting a promoter investigation of Artex under 26 U.S.C. § 6700.[5] The IRS recently included abusive captive insurance structures on their 2015 dirty dozen list of "[i]llegal scams [that] can lead to significant penalties and *possible criminal prosecution*." I.R.S. News Release IR-2015-19 (Feb. 3, 2015) (emphasis added). Further, the Internal Revenue Manual contemplates the possibility of criminal prosecution of participants to combat abusive transaction promotions. IRM § 4.32.2.2 ("The IRS combats AT [Abusive Transaction] promotions by: … criminally prosecuting promoters, preparers, or participants."); IRM § 4.32.2.4 ("There are many tools available to the IRS to address the promotion of and the participation in an AT activity, including : … C. Criminal prosecution of individuals who organize; promote; sell; or assist in the organization, promotion, or sale of an AT activity; and, potentially, participants in the activity."). The United States even acknowledged at the show cause hearing that while every IRS civil investigation carries the potential for criminal prosecution, the promoter examination involving the use of the captive insurance structure sets this case apart from such a standard civil case (Dkt. 17 at p. 22). Considering Revenue Agent Britten's questions in this larger context underscores the conclusion that Respondent's fear of

---

[5] There is some dispute between the parties as to whether the IRS's investigation of Artex remains civil or has become criminal. However, the court need not determine whether there is sufficient proof of an active criminal investigation of Artex to recommend a resolution of this petition.

criminal prosecution is not a product of his unchecked imagination. *Castro*, 129 F.3d at 239. To the contrary, the possibility is quite real.

The government's reliance on the fact that there has been no criminal referral with respect to Northern Tree Service is misplaced. The absence of a Justice Department referral is a statutory requirement for the issuance of a summons or the commencement of an enforcement action. *See* 26 U.S.C. § 7602(d). *See also LaSalle*, 437 U.S. at 317. It does not establish that Respondent's fear of prosecution is insubstantial or unreal. Similarly misplaced is the government's argument that the IRS has not abandoned its civil investigation. Again, the requirement that the "Service not [have] abandon[ed] in an institutional sense … the pursuit of civil tax determination or collection," is a requirement for finding that the IRS is acting in good faith. *LaSalle*, 437 U.S. at 314. Respondent is not challenging the good faith of the IRS.

Finally, the United States incorrectly characterizes Respondent's invocation of the privilege in response to every question as a prohibited blanket assertion of the privilege. The prohibition on invocation of the privilege on a blanket basis is grounded in the court's need to know the precise questions to be put to the witness in order to make the question-by-question determination as to the applicability of the privilege. *Vazquez-Rijos v. Anhang*, 654 F.3d 122, 129 (1st Cir. 2011) (citing *Pratt*, 913 F.2d at 990). "It is true that a blanket refusal … to testify will not support a fifth amendment claim." *Argomaniz*, 925 F.2d at 1356 (citing *United States v. Roundtree*, 420 F.2d 845, 852 (5th Cir. 1969)). "However, [Respondent] did not refuse to comply with the summons in a blanket manner. Instead [Respondent] followed the general rule that a taxpayer 'must present himself … for questioning, and as to each question … elect to raise or not to raise the defense." *Id*. As a result, the court has a record of the questions Revenue Agent Britten put to Respondent. The fact that Respondent answered every question by invoking

16

the Fifth Amendment in no way detracts from the court's ability to evaluate whether the privilege attaches to each question, all of which, pivotally, relate to the captive insurance transactions under investigation, which the government considers to have been abusive.

Because it is not "'perfectly clear' that [Respondent] is mistaken and that the answers 'cannot possibly' incriminate," *Johnson*, 488 F.2d at 1209 (quoting *Hoffman*, 341 U.S. at 487-488), Respondent has validly asserted his Fifth Amendment privilege in response to each of Revenue Agent Britten's questions, each of which sought to elicit testimony that could be used in a criminal prosecution of Respondent for tax evasion or false statements or could lead to other evidence that might be so used.  *Kastigar*, 406 U.S. at 444-45; *Hoffman*, 341 U.S. at 485-86; *Kave*, 760 F.2d at 354.

V.     Conclusion

This court finds that the IRS is already in possession of all of the documents sought by its document summons, and therefore, it is not entitled to an order of enforcement as to it.  The court further finds that Respondent properly appeared in response to the IRS summons for testimony and properly invoked his Fifth Amendment privilege against compelled self-incrimination in response to each of the questions posed to him by IRS Revenue Agent Britten. Accordingly, the court RECOMMENDS that the government's petition to enforce as to both summonses (Dkt. No. 1) be DISMISSED.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge